**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Paul M. BALDINGER, Defendant–Appellant.**

No. 85–5687.

United States Court of Appeals, Sixth Circuit.

Argued July 2, 1986.

Decided Feb. 1, 1988.

Thomas H. Dundon (argued) Neal and Harwell, Nashville, Tenn., for defendant-appellant.

Joe B. Brown, U.S. Atty., Nashville, Tenn., Robert J. Washko (argued), for plaintiff-appellee.

Before ENGEL and KENNEDY, Circuit Judges; and CONTIE,* Senior Circuit Judge.

ENGEL, Circuit Judge.

This appeal requires us to decide whether letters mailed to customers of appellant's business associate falsely and maliciously stating that his associate was conducting polygraph examinations without a license constituted a "scheme or artifice to defraud" within the mail fraud statute, 18 U.S.C. § 1341.

Paul M. Baldinger appeals his conviction following a jury trial in the United States District Court for the Middle District of Tennessee on twenty counts of mail fraud. Baldinger and Roger Fleming were licensed polygraph examiners engaged in separate practices. For some time, they maintained an amicable business relationship. In 1981, they informally agreed to provide services for each other's clients when one of them was unavailable, and in 1982 they began to share office space. Later in 1982, however, a dispute arose between them when Fleming acquired an account that Baldinger had been pursuing.

* Judge Contie assumed senior status on July 1, 1986, after this case was heard and submitted.

In an attempt to get even, Baldinger volunteered in December, 1982, to pay the annual fee for renewing Fleming's polygraph examiner's license. He wrote out a check to the Tennessee Polygraph Examiners Board, and Fleming prepared the envelope. But Baldinger removed the envelope from the outgoing mail and the envelope never reached the Board. In May and June, 1983, Baldinger mailed letters to nineteen of Fleming's clients. The letters stated that Fleming was administering polygraph examinations without a license and advised the clients to avoid further testing until the licensing matter was corrected. Several of the letters to Fleming's clients gave the appearance that they were sent by the Polygraph Examiners Board, while others purported to be sent by "Ronald D. Abernathy, Director."

Baldinger also mailed an anonymous letter to Victor Hartman, a test subject, who had been examined by Fleming in the course of a job application. The test results indicated dishonesty on Hartman's part. The letter to Hartman stated that Fleming was unlicensed and that Hartman could file a complaint with the Polygraph Examiners Board or that he might "wish to bring a law suit against Mr. Fleming ... and collect a considerable settlement in cash for their illegal testing." Baldinger included with the letter a proposed complaint that he drafted.

Baldinger was indicted on twenty counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342.[1] The indictment alleges that Baldinger "devise[d] a scheme and artifice to defraud Roger Fleming and persons doing business with Fleming of their right to conduct business free of false, fictitious, and fraudulent information concerning the status of Fleming's polygraph license." The indictment characterizes Fleming as "a business associate of the defendant," and the indictment goes on to allege the specific acts described above.

Baldinger moved to dismiss the indictment on the ground that it did not allege a violation of section 1341. The district court denied the motion. A jury found Baldinger guilty on all twenty counts. He was sentenced to three years of imprisonment on Count 1, to be followed by probation for concurrent periods of three years on each of Counts 2 through 20.

After we heard oral argument in this case, the Supreme Court announced its opinion in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Convinced that *McNally* could have a major impact on this case, we requested additional briefing. Since that time the Supreme Court has further refined its opinion about the scope of section 1341 in *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

The defendants in *McNally* were Kentucky government officials who were charged with diverting the commissions for the State of Kentucky's workmen's compensation policies from the insurance agency deserving them to certain other agencies, including ones they controlled. They were convicted for violating section 1341 on the theory that they had sought to "defraud the citizens and government of Ken-

---

1. Section 1341 states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing ... or takes or receives therefrom any such matter or thing, or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
Section 1342 states:

Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address or name other than his own proper name, shall be fined not more than $1,000 or imprisoned not more than five years or both.

tucky of their right to have the Commonwealth's affairs conducted honestly." *McNally,* 107 S.Ct. at 2875. In reversing the conviction, the Court stated that "those commissions were not the Commonwealth's money ... the premium for insurance would have been paid to some agency." *Id.* at 2882.

As written, *McNally* left us with at least some uncertainty whether it might have been intended to limit prosecutions only in cases involving the corruption of public officials. The Court announced that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *Id.* at 2879. However, in some of its language it seemed to take a broader approach, announcing that it "read § 1341 as limited in scope to the protection of property rights." *Id.* at 2881.

While we are not certain that the last word has yet been spoken, we find at least some clarification in the Supreme Court's decision just issued in *Carpenter v. United States, supra.* In *Carpenter,* the Court applied *McNally* to the case of a financial columnist for the Wall Street Journal and his friends who had profited on the stock market by trading based on the columnist's information before it was published. The Court found that Carpenter and his associates could be convicted under section 1341 because the Wall Street Journal's interest in keeping its stories confidential until publication was a property interest.

■ *Carpenter* stands for the narrow principle that *McNally* was not intended to exclude from the purview of section 1341 fraudulent schemes and artifices merely because the property interest involved was normally defined as an intangible one. Had the Supreme Court conceived that *McNally* was limited only to the dishonest acts and corruption of public officials, it would, of course, never have felt it necessary in *Carpenter* to go beyond stating that fact and noting that *Carpenter* itself only involved a purely private wrongdoing. From this, we are led to conclude that while the Supreme Court recognized both tangible and intangible property interests,

they nonetheless clearly intended to exclude from the reach of the mail fraud statute claims which did not involve a direct intention to deprive another of a recognized and traditional property right (tangible or intangible) through the employment of fraud or other artifice and the use of the public mail. In our view, therefore, *McNally* rejects that line of cases which predicates criminal liability only upon general acts of dishonesty or illegality unrelated to motives of property gain, whatever its nature. *See e.g., United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982); *United States v. Barta,* 635 F.2d 999 (2d Cir.1980).

In its supplemental brief, the government argues that Baldinger's conviction can still be upheld despite the *McNally* decision. It first claims that defendant's categorization of this case as being one involving intangible rights *is not entirely accurate.*

> This case has always concerned the *property* rights of the victim Roger Fleming, i.e., the attempt by Baldinger to disparage and to destroy Fleming's good name and "good will" and to obtain such "good will" for his (Baldinger's) use and benefit.
>
> It is beyond dispute and well settled that "good will" is property of an intangible nature and the term "property" includes "good will."

By this argument the government seeks to align itself with the holding in *Carpenter* that *McNally* was not intended to prohibit prosecution under section 1341 for appropriating property rights of an intangible nature.

To fit within the newly constricted boundaries of section 1341, the government seeks to show that Baldinger intended to appropriate Fleming's good will. The government stresses that the purpose of Baldinger's scheme was not only to "ruin the good will that Fleming had established and which was the source of his livelihood, but to obtain that source, i.e. Fleming's corporate accounts/clients for himself." We agree that there was some evidence from which the jury could infer that Bal-

dinger's scheme was motivated by hope of economic gain as well as revenge or malice. So much was argued by government counsel in closing arguments to the jury:

> And we know from the evidence adduced that one of the main reasons was that Roger Fleming had one of the clients that Mr. Baldinger for some time had wanted to obtain, and that is Southern Hospitality Corporation. That was a corporate account that Mr. Baldinger wanted very, very badly, and he didn't have it.[2]

Having set out a factual basis for the conviction on the theory that Baldinger sought to appropriate Fleming's good will, the government next attempts to show that the jury instructions and the indictment were valid under *McNally*. It notes that the district court's charge to the jury tracked the language of section 1341 by stating: "The words scheme and artifice include any plan or course of action intended to deceive others and to obtain by false or fraudulent pretenses, representations or promises else [sic] money or property from persons so deceived." The government then goes on to admit quite candidly that had *McNally* been decided prior to the indictment there is little question but that the wording and manner in which the indictment was drafted would have been different, in order to preclude the present issue from being raised. Notwithstanding that, the government claims that the indictment states an offense cognizable under the mail fraud statute.

■ We conclude that through its decisions in *McNally* and *Carpenter*, the Supreme Court has identified itself with the position that section 1341, in prohibiting "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" was intended by the Congress only to reach schemes "that have as their goal the transfer of something of economic value to the defendant." Comment, *The Intangible Rights Doctrine and Political–Corruption Prosecutions Under the Mail Fraud Statute*, 47 U.Chi.L.Rev. 562, 566 (1980). It therefore follows that an indictment which falls short of this standard cannot stand.

■ Whatever might be said of the proofs or the arguments before the jury, we are satisfied that the indictment here was insufficient in light of *McNally* and *Carpenter* because it was couched solely in terms of the intangible rights theory expressly rejected by *McNally*. That the jury might have believed, under one construction of the proofs, that Baldinger was motivated by personal gain is not sufficient to justify upholding the conviction here; it might equally have believed that it could convict even if that element was missing. This is error under *McNally* and *Carpenter*.

We are thus led to conclude that the conduct alleged in Baldinger's indictment as violative of section 1341 fails to include the proprietary gain ingredient which the Supreme Court in *McNally* held was essential. The indictment permits the jury to return a guilty verdict based upon no more than general allegations of dishonesty, allegations which, for the most part, amount to defamation and not to the traditional notions of fraudulent misconduct which section 1341 seeks to prohibit.[3]

---

**2.** We note that Southern Hospitality Corporation is not one of the organizations that the indictment alleges was deceived by Baldinger. However, Baldinger did contact one of its employees, Victor Hartman, who had been tested by Fleming. He informed Hartman that Fleming had no license and therefore that Hartman could sue either Fleming or his employer or both. Such a tactic could easily have been aimed at disrupting the business relationship between Fleming and Southern Hospitality Corporation.

**3.** The distinction between conduct motivated by an intent to deprive the victim of his property and conduct motivated solely by a desire to harm the reputation of the victim is dramatically illustrated by Iago's comments in Shakespeare's *Othello*:

> Who steals my purse steals trash; 'tis something, nothing;
> 'Twas mine, 'tis his, and has been slave to thousands;
> But he that filches from me my good name
> Robs me of that which not enriches him
> And makes me poor indeed.

*Othello*, Act III, Scene iii.

█ A recent case in this circuit raises the further question whether prosecution, though based primarily upon the rejected intangible rights theory, might still be upheld where the facts charged in the indictment and the proofs indicate that the defendant's conduct was motivated by a theory otherwise permissible under section 1341. *United States v. Runnels*, 833 F.2d 1183 (6th Cir.1987). In *Runnels*, Frank Runnels and Arnold Shapiro were both charged with violating section 1341. Shapiro, an attorney, made payments to Runnels, a local union president, in return for Runnels' referral of all workmen's compensation claims arising from his union to Shapiro. The indictment, issued before the *McNally* decision, charged that Runnels committed mail fraud by "obtaining money through false and fraudulent pretenses and by depriving the members of Local 22 of his fair and honest services." *Id.*, at 1184.

Judge Boggs held that to the extent the prosecution proceeded by arguing that Runnels denied the union members his honest services, such a theory was invalid under *McNally*. However, he found that Runnels had a fiduciary duty to the union which he breached by accepting a bribe for himself. Although the fiduciary theory was not included in the indictment or presented at trial, Judge Boggs held that the factual findings necessary to support a conviction on a fiduciary duty theory were identical to those necessary to support the conviction on an intangible rights theory and that therefore Runnels's right to defend himself on the permissible charge was not impaired. He thus upheld the conviction.

Judge Guy took issue with this reasoning in his dissent. Accepting for the sake of argument Judge Boggs' observation that the factual findings required for either the fiduciary duty theory or the intangible rights theory were identical, Judge Guy stated:

> Even had Runnels chosen to present the same defense, he may have made dramatically different tactical decisions in advancing his position. Thus, even though conviction on the intangible rights theories may encompass all the factual findings necessary to a conviction on the economic benefits theory, in my opinion, defendant is prejudiced by not having the opportunity to prepare a defense based on the later theory.

*Id.* at 1195 (Guy, dissenting).

*Runnels* presents very close value judgments relating to inherent fairness and opportunity to defend. Here, however, our task is easier. There is no doubt that a change in the prosecution's theory here as pleaded in the indictment would have had a massive impact on Baldinger's defense. Whereas under the intangible rights theory he had little choice except to deny the allegations against him, under the economic benefit theory he could admit his acts and still defend himself by arguing that he sought only revenge, not profit. He could effectively argue that his conduct, however loathesome it might otherwise be, was not motivated by hope or expectations of personal gain. This theory has great appeal, for plainly if there were mixed motives, pure malice predominated. Baldinger would not dare present such a defense under an intangible rights theory of criminal liability for he would only have convicted himself by his own admission.

One of the principal purposes of an indictment is to inform the defendant of that which he is called upon to defend. The indictment here gave no warning to Baldinger that he might be accused of appropriating Fleming's good will. It is therefore obvious that it would be unduly prejudicial to Baldinger to uphold his conviction on an economic benefit ground when this issue was not fully presented at trial.

This appeal differs procedurally from *McNally*. There, error was predicated solely upon the trial court's jury instructions which were found not to describe conduct cognizable under section 1341. Appellant's challenge here has been solely to the sufficiency of the indictment to describe a crime under section 1341. The error here, therefore, is even more fundamental. Since we conclude that the indictment is insufficient, the judgment of conviction is REVERSED and the cause is

REMANDED with directions to DISMISS the indictment.