**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Fred A. SHELTON,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marvin JAMES, Defendant–Appellant.**

**Nos. 87–2865, 88–1017.**

United States Court of Appeals,
Tenth Circuit.

May 26, 1988.

---

Gerhard Kleinschmidt, Fort Worth, Tex., for defendant-appellant Shelton.

Charles Gaunce of Stipe, Gossett, Stipe, Harper, Estes, McCune & Parks, Oklahoma City, Okl., for defendant-appellant James.

Roger Hilfiger, U.S. Atty., E.D. Oklahoma, and Sara Criscitelli, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, and BALDOCK, Circuit Judges.

SEYMOUR, Circuit Judge.

Fred A. Shelton and Marvin James brought habeas corpus actions pursuant to 28 U.S.C. § 2255 (1982), asserting that their convictions under the mail fraud statute, 18 U.S.C. § 1341 (1982), are invalid in light of the Supreme Court's decision in *McNally v. United States*, — U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). The district court ruled that *McNally* should not be given retroactive effect in the context of a section 2255 proceeding, and denied relief. We heard the resulting appeals en banc, and we now hold that *McNally* should be applied retroactively. We also hold that each petitioner had cause for failing to raise the issue earlier and has established prejudice entitling him to issuance of the writ.

## I.

In *McNally*, the defendants were charged with committing mail fraud by participating in a scheme whereby they gave state insurance business to an insurance agency that agreed to split the resulting commissions with them. "The prosecution's principal theory of the case ... was that petitioners' participation in a self-dealing patronage scheme defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly." *McNally*, 107 S.Ct. at 2877. The Supreme Court observed that the case before it was one of a "line of decisions from the Courts of Appeals holding that the mail fraud statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government." *Id.* at 2879. The Court, however, construed the statute to reach only frauds involving money or property. *Id.* at 2881. Because the jury instructions in *McNally* permitted a guilty verdict based solely on loss of the right to honest government, and did not require the jury to find that the victims of the fraud had lost money or property, the Court reversed the convic-

tions. In *Carpenter v. United States*, ——— U.S. ———, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987), the Court reiterated its holding that the right to "honest and faithful service [is] an interest too ethereal in itself to fall within the protection of the mail fraud statute."

Shelton and James are former Oklahoma county commissioners who were tried and convicted on indictments charging them with, inter alia, committing mail fraud by accepting kickbacks in connection with county purchases, thereby defrauding county citizens of the right to have county business conducted free from corruption and undue influence. The frauds are set out in more detail in the opinions affirming their convictions on direct appeal. *See United States v. Shelton*, 736 F.2d 1397, 1399 (10th Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984); *United States v. James*, 728 F.2d 465, 466 (10th Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984). Both convictions in the instant proceedings became final before the Supreme Court decided *McNally*, and neither defendant raised the *McNally* issue at trial or in his direct appeal.

Shelton and James maintain that *McNally* invalidates their convictions, and that the district court erred in refusing to apply that decision retroactively when considering their section 2255 motions. On appeal, the Government concedes that *McNally* applies retroactively in a federal habeas proceeding. The Government contends, however, that relief is nonetheless barred because petitioners have failed to satisfy the cause and prejudice inquiry mandated by *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), when a federal prisoner asserts a defaulted claim in a collateral challenge to his conviction under section 2255. Although the Government concedes that Shelton and James had the requisite cause for their failure to raise the issue earlier, it argues that neither petitioner has established sufficient prejudice to entitle him to relief. Subsumed in

this argument is the contention that there is no possibility, as there was in *McNally*, that either Shelton or James was convicted of conduct that does not constitute a federal crime.

We are one of the first appellate courts to consider the issues conceded by the Government, namely the retroactivity of *McNally* in a habeas proceeding and the adequacy of cause for defaulting that claim.[1] In view of the large number of cases in this circuit which are likely to be affected by these legal issues, and the divergent views of the courts that have considered them, *compare United States v. Smith*, 675 F.Supp. 978 (M.D.Pa.1987) (*McNally* not retroactively applied) and *United States v. Callanan*, 671 F.Supp. 487 (E.D.Mich.1987) (same) *with Ingber v. Enzor*, 841 F.2d 450 (2d Cir.1988) (*McNally* retroactively applied) *and United States v. Mandel*, 672 F.Supp. 864 (D.Md.1987) (*McNally* retroactively applied in application for writ of coram nobis), we believe it appropriate to resolve these questions independently of the Government's concessions. *Accord Strauss v. United States*, 516 F.2d 980, 982 (7th Cir.1975).

## II.

In concluding that *McNally* could not be applied retroactively in motions brought under section 2255, the district court applied the three-step retroactivity test set forth in *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986). In so doing, the court employed the wrong legal standard.

This test, which was first articulated in *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965), is used to determine "the extent to which a decision announcing a new constitutional *rule of criminal procedure* should be given retroactive effect." *Allen*, 106 S.Ct. at 2880 (emphasis added). The Supreme Court has pointed out that the *Linkletter*

---

1. The Second Circuit has concluded that *McNally* applies retroactively when a petitioner seeks relief under 28 U.S.C. § 2255. *See Ingber v. Enzor*, 841 F.2d 450, 453–54 (2d Cir.1988). The court also indicated that the petitioner there had cause for his failure to raise the issue on direct appeal. *See id.* at 454–55.

test applies to "those constitutional interpretations bearing on the use of evidence or on a particular mode of trial," *Robinson v. Neil,* 409 U.S. 505, 508, 93 S.Ct. 876, 877–78, 35 L.Ed.2d 29 (1973), and that decisions which do not deal with procedural rights and methods of conducting trials "cannot, for retroactivity purposes, be lumped conveniently together in terms of analysis," *id.* In *Robinson,* the Court distinguished, for purposes of retroactivity, between a decision announcing a new procedural rule and a decision announcing a new substantive constitutional principle whose practical result "is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial." *Id.* at 509, 93 S.Ct. at 878. The Court concluded that in the latter situation, the *Linkletter* analysis is simply not appropriate. *Id.* at 508, 93 S.Ct. at 877.

In the instant case, we are concerned with the retroactivity of a substantive non-constitutional decision concerning the reach of a federal statute, rather than a substantive decision on the scope of a constitutional guarantee like that at issue in *Robinson.* However, the practical effect of both decisions is the same; the defendant is not subject to trial on the charge. Accordingly, we believe that the rationale articulated by the Court in *Robinson* in concluding that the *Linkletter* test was not appropriate is equally applicable here. *See Ingber,* 841 F.2d at 454 n. 1 (criminal procedure cases have no bearing on retroactivity of new rule of substantive law); *McClain v. United States,* 643 F.2d 911, 913 (2d Cir.1981) (*Linkletter* test not appropriate where defendant convicted for acts subsequently held not criminal), *cert. denied,* 459 U.S. 879, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982).

Our conclusion is supported by *Davis v. United States,* 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), where the Supreme Court addressed whether a federal prisoner could assert, in a section 2255 motion, a change in *circuit court* law occurring after his conviction was affirmed.[2] The subsequent decision in *Davis,* like that in *McNally,* had interpreted the federal statute under which the petitioner was convicted so that it allegedly did not reach the petitioner's conduct. The Supreme Court stated that "the appropriate inquiry was whether the claimed error of law was 'a fundamental defect which inherently results in a complete miscarriage of justice,' and whether '[i]t ... present[s] exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent.'" *Id.* at 346, 94 S.Ct. at 2305 (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)). The Court then answered this inquiry in the affirmative, stating there could be no doubt that the above conditions were satisfied if the petitioner had in fact been convicted and punished for an act the law did not make criminal.

Two appellate decisions have relied on *Davis* to permit a federal habeas prisoner to assert a claim for collateral relief based on a subsequent Supreme Court opinion construing a federal criminal statute to exclude the conduct underlying the petitioner's conviction. *See United States v. Bonnette,* 781 F.2d 357, 362–64 (4th Cir.1986); *Strauss,* 516 F.2d at 983–84.[3] The court in *Strauss* pointed out that a statute cannot "mean one thing prior to the Supreme Court's interpretation and something entirely different afterwards." 516 F.2d at

---

**2.** Although the change in circuit law was based on a Supreme Court decision handed down after the petitioner's conviction, the Court expressly stated that it was not deciding the retroactive application of its own decision due to the unusual procedural posture of the case before it. 417 U.S. at 341 n. 12, 94 S.Ct. at 2303 n. 12.

**3.** In both *Strauss* and *Bonnette* the court made separate inquiries into whether the intervening decision could be applied retroactively in collateral proceedings, and whether collateral relief

was available. In *Strauss,* the court considered *Davis* only in the context of the availability of collateral relief, *see* 516 F.2d at 983–84, while in *Bonnette,* the court relied on *Davis* only to conclude that retroactivity was required, *see* 781 F.2d at 362–64. We too have separated our consideration of retroactivity and the availability of collateral relief. However, as the above cases indicate, *Davis* arguably speaks to both issues and the analysis may so overlap that the inquiries in effect become one.

983 (quoting *Gates v. United States*, 515 F.2d 73, 78 (7th Cir.1975)). The court concluded accordingly that retroactivity was mandated because the Supreme Court decision had declared what the law meant from the date of its enactment, and that "the prior interpretation is, and always was, invalid." *Id.* (quoting *Brough v. United States*, 454 F.2d 370, 372 (7th Cir.1971)). In *Bonnette*, the court observed that prior to the decision in *Davis*, 417 U.S. 333, 94 S.Ct. 2298, the Fourth Circuit and other courts had denied retroactive effect to "decisions in which a court reinterprets a criminal statute so as to narrow it, thus essentially repealing the statute as to some defendants." 781 F.2d at 362. The court concluded that non-retroactivity was no longer proper because "the very breadth of the decision in *Davis* implicitly rejects the holding" in that line of cases. *Id.* at 364.

We agree with the analysis in both *Strauss* and *Bonnette* and conclude that the opinion in *McNally* must be given retroactive effect in a section 2255 proceeding.

### III.

In *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982), the Supreme Court held that a federal prisoner who has defaulted the claim he seeks to assert in a section 2255 motion must satisfy the cause and actual prejudice standard set out in *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), and *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed. 2d 594 (1977).

#### A. Cause

In *Reed v. Ross*, 468 U.S. 1, 15–16, 104 S.Ct. 2901, 2909–10, 82 L.Ed.2d 1 (1984), the Court held that a habeas petitioner has cause for failing to raise a claim if it had "no reasonable basis in existing law." The Court pointed out that this standard is satisfied when a Supreme Court decision overturns " 'a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved.' " *Id.* at 17, 104 S.Ct. at 2910 (quoting *United States v. Johnson*, 457 U.S. 537, 551, 102 S.Ct. 2579, 2588, 73 L.Ed. 2d 202 (1982)).

The decision in *McNally*, by limiting the reach of the mail fraud statute to deprivations of money or property, rejected the broader construction adopted by every circuit that had addressed the issue. "[V]ariously described as 'blockbusting,' as 'a total surprise' and as a 'wholly unexpected explication of the law of mail fraud,' [*McNally*] was, without a doubt, a departure from the law of every court of appeals —including this one—to consider the issue of intangible rights mail fraud prosecutions." *United States v. Ochs*, 842 F.2d 515, 521 (1st Cir.1988) (citations omitted). The context of the *McNally* decision thus presents the quintessential circumstance in which a defaulted claim had so little basis in existing law that a habeas petitioner had cause for failing to raise it.[4] *Accord Ingber*, 841 F.2d at 454–55.

#### B. Prejudice

We therefore turn to the Government's assertion that Shelton and James are nonetheless not entitled to collateral relief because they have failed to establish actual prejudice resulting from the erroneous theory of mail fraud underlying their convictions. Our review of the record convinces

---

4. In view of the Court's conclusion in *Davis*, 417 U.S. at 346–47, 94 S.Ct. at 2305, that conviction and punishment for conduct that is not criminal would undoubtedly result in a complete miscarriage of justice presenting exceptional circumstances, a compelling argument can be made that the claim raised in the instant proceedings is available in a section 2255 motion without regard for whether the petitioner had cause for any default. *See United States v. Angelos*, 763 F.2d 859, 861 (7th Cir.1985) (defendant who did not appeal would be entitled to collateral relief by showing "that under no possible view of his conduct was he guilty of a federal crime"); *Hussong v. Warden*, 623 F.2d 1185, 1190 n. 13 (7th Cir.1980) (*Hill* standard may apply to all non-constitutional claims); *cf. Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2650, 91 L.Ed.2d 397 (1986) ("where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default").

us that the petitioners were prejudiced, although in different ways, and we will therefore address this issue with respect to each petitioner individually. However, as an initial matter we will consider the Government's argument with respect to both petitioners that they were each fiduciaries who constructively defrauded their governments of money by accepting kickbacks for performing their jobs.

### 1. Constructive Trust Theory

■ James and Shelton were both charged with defrauding the citizens of their respective counties of their right to honest government by taking ten percent kickbacks from suppliers who sold goods to the counties. The Government did not charge that the counties lost money because of the kickbacks. Indeed, the evidence at trial tended to show that the sales were made at a previously established low price and that the kickbacks were paid out of the suppliers' profits, which ordinarily were about thirty percent. *See infra* at 1496–97. Although the Government thus did not prove that the counties lost money,[5] the Government had no need to make such a showing given the state of the law at the time. Now, however, the Government seeks to avoid the impact of *McNally* by contending that the counties constructively lost money.

At least one circuit has agreed with this theory. In *United States v. Runnels*, 833 F.2d 1183 (6th Cir.1987), the court considered on direct appeal the effect of *McNally* on the conviction of a defendant charged with defrauding union members of their intangible right to fair and honest union representation by taking bribes. Although recognizing that the intangible rights doctrine is invalid after *McNally*, the court affirmed the convictions on an alternative rationale, "based on the fraud that occurs when a fiduciary breaches his duty by appropriating an economic benefit that properly should be the principal's." *Id.* at

1186. The court concluded that "the economic deprivation to the principal which occurs when the fiduciary knowingly breaches his duty by accepting a bribe, the value of which properly belongs to the principal, is itself sufficient to support a finding of taking of value." *Id.* at 1187. The court held that this value constitutes a loss of money or property within the ambit of the mail fraud statute as construed in *McNally*.

The *Runnels* decision has been persuasively critized on several grounds. The dissent in that case, while agreeing that the constructive trust theory is sound, argued for reversal of the conviction because the theory had not been advanced at trial and the defendant had thus been prejudiced by not having the opportunity to defend against it. *See id.* at 1194–95. Other circuits have taken issue with *Runnels'* holding that a constructive trust theory can save a conviction that is otherwise invalid under *McNally*. *See Ochs*, 842 F.2d 515, 525–27 (1st Cir.1988); *United States v. Holzer*, 840 F.2d 1343, 1346–48 (7th Cir. 1988). In *Ochs*, the underlying fraudulent scheme was a conspiracy to lowball a construction bid, thereby reducing the amount of a city building permit that was based on the cost of construction. The mail fraud count charged three separate frauds, one of which was grounded on intangible rights and two of which involved money. The jury was instructed on all three frauds and the defendant was convicted on that count. In reversing the mail fraud conviction, the court strongly disagreed with the theory adopted in *Runnels*, concluding "that such an expansive view of property protected by the mail fraud statute is irreconcilable with the basic holding of *McNally*." 842 F.2d at 525. The court pointed out that in *McNally*, "[w]ith the issue squarely before it, the Court held that the mere fact that a fiduciary profits from a breach of duty is not a sufficient property deprivation to satisfy the requirements of the mail fraud statute

---

5. Shelton was also charged with doing "fifty-fifty splits" in some instances. *See infra* at 1495. A "split deal" was an alleged scheme whereby suppliers on occasion would send in a phony invoice for goods that were never delivered, and then would split the payment with Shelton. In such a scheme, the county would necessarily be defrauded of money. However, Shelton was not convicted of any split deals. *See infra* at 1496.

if the profit was not, directly or indirectly, at the principal's expense." *Id.* at 526.

In *Holzer,* the court reviewed the conviction of a judge charged with accepting bribes, thereby defrauding citizens of their right to have justice administered fairly. The court noted the lack of any showing that the victims of the fraud lost money or property, and then considered whether the convictions were nonetheless sustainable under the theory in *Runnels.* The court concluded that the constructive trust theory as it relates to bribes and kickbacks does not satisfy *McNally* because retaining a bribe or kickback does not divert money intended for the employer, thereby depriving the employer of property that is rightfully his. 840 F.2d at 1348.

"A constructive trust is imposed on the bribes not because Holzer intercepted money intended for the state or failed to account for money received on the state's account but in order to deter bribery by depriving the bribed official of the benefit of the bribes. Unless we assume unreasonably that the state wants Holzer to take bribes so that it can recoup them under constructive trust principles, the state's financial situation is the same whether he takes bribes or doesn't take bribes. The only difference between the two situations is that in the first Holzer has deprived the state of its intangible right to honest civil servants. This is an intangible-rights case and only an intangible-rights case."

*Id.*

We agree with the discussions in *Ochs* and *Holzer.* In rejecting the intangible rights theory, the Supreme Court in *McNally* characterized that theory as one under which "a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud." 107 S.Ct. at 2879. This discredited version of mail fraud is indistinguishable from that espoused in *Runnels.* Accordingly, we conclude that the theory of equitable or constructive trust will not save a conviction that is otherwise grounded solely on the deprivation of intangible rights.

### 2. Marvin James

James was charged in a forty-three count indictment with thirty-eight counts of mail fraud, and five counts of extortion in violation of 18 U.S.C. § 1951 (1982). He was acquitted on fifteen mail fraud counts and two extortion counts. The mail fraud counts on which he was convicted all incorporate the first count by reference. That count provides in pertinent part:

"1. At all times material to this indictment, MARVIN JAMES, the defendant herein, was an elected County Commissioner for McIntosh County, Oklahoma.

"2. At all times material to this indictment, MARVIN·JAMES, in the performance of his official duties as County Commissioner would place orders and arrange the purchase of materials and supplies from various vendors doing business with McIntosh County, thereby causing the County Clerk's Office of that county to encumber funds and send through the U.S. Mails county warrants or checks in payment for the materials and supplies purchased.

"3. At all times material to this indictment, MARVIN JAMES was under a duty to the citizens of McIntosh County to perform the functions of his office openly, honestly, impartially, free from corruption and undue influence, without receiving directly or indirectly, any money or other valuable thing for the performance or non-performance of any act or duty pertaining to this office other than the compensation allowed by law.

"4. During the period commencing on or about January 8, 1973, and continuing thereafter to on or about Dec. 14, 1981, MARVIN JAMES, the defendant herein, while serving as County Commissioner of McIntosh County, *devised and intended to devise a scheme to defraud the citizens of McIntosh County out of their right to have the business of McIntosh County conducted openly, honestly, impartially, free from corruption and undue influence* and in accordance with the Official Oath of Office by their elected County Commissioner, and to use the U.S. Mails in furtherance of the scheme.

"5. *As a part of this scheme to defraud the citizens of McIntosh County,* MARVIN JAMES, in his official capacity as a County Commissioner of McIntosh County, *did place orders and arrange the purchase of equipment, equipment parts and service, road and bridge building and maintenance materials and supplies for McIntosh County from various vendors,* and, in particular, Richard Henry Peak, d/b/a Muskogee Equipment and Supply Co., Inc., Muskogee, Oklahoma; Bill Klutts, d/b/a Okie Equipment Co., Meeker, Oklahoma; Marshall Greenman, d/b/a/ Eastern Equipment Co., Muskogee, Oklahoma; Donald Skipworth, d/b/a Caddo Material and Equipment Co., Oklahoma City, Oklahoma; Joe Swank, d/b/a Port City Road Supplies, Muskogee, Oklahoma, and Ed Wilson, d/b/a Wilson Material Co., Oklahoma City, Oklahoma. It was a further part of the scheme that the *defendant did receive from these sellers of road and bridge building and maintenance supplies cash kickbacks.*"

Rec., vol. I, doc. 1, at 1–2 (emphasis added).

■ As James points out in this appeal, the indictment expressly charges only a scheme to defraud county citizens of intangible rights by the acceptance of kickbacks from third persons. The indictment contains no language which can be construed to allege that the victims of the fraud were deprived of money or property. Accordingly the indictment fails to charge a violation of the mail fraud statute as it has been construed in *McNally.*[6]

The Government raises two related arguments in its attempt to overcome the patent insufficiency of the indictment: first it contends that the inadequate indictment did not prejudice James, and second it asserts that the evidence and instructions at trial satisfy *McNally.* These arguments mis-

perceive the constitutional protections incorporated in the Fifth and Sixth Amendments.

■ The Fifth Amendment provides in part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." The related provision of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation...." We discussed at length the role a criminal indictment plays in protecting these rights in *United States v. Radetsky,* 535 F.2d 556, 561–62 (10th Cir.1976). We there expressed our concern with the fundamental guaranty to be tried only on charges made by a grand jury. "The substantial safeguard of the guaranty to those charged with serious crimes cannot be eradicated under the claim that variations are mere technical departures from the rules." *Id.* at 562. Of particular relevance to the arguments the Government asserts in the instant appeal, *Radetsky* states:

"The purposes and requirements for the sufficiency of indictments have been variously stated, but the essentials are clear. First, the indictment must contain the elements of the offense and sufficiently apprise the defendant of what he must be prepared to meet.... Furthermore, and of paramount importance, a sufficient indictment is required to implement the Fifth Amendment guaranty and make clear the charges so as to limit a defendant's jeopardy to offenses charged by a group of his fellow citizens, and to avoid his conviction on facts not found, or perhaps not even presented to, the grand jury that indicted him."

*Id.* (citations omitted).

The Government's argument that the indictment provided James with adequate no-

---

**6.** We reject out of hand the Government's argument that the indictment is sufficient because it alleges a pecuniary fraud by charging that James, by obtaining kickbacks, received money to which he was not entitled. This is, in effect, an assertion of the constructive trust theory disapproved in Part II B, *supra.*

We likewise reject the Government's attempt to analogize the fraud alleged in this case to those cases in which the charged deprivation of

intangible rights was, by the very nature of the fraud involved, necessarily inextricably intertwined with the victim's loss of money or property. *See, e.g., United States v. Piccolo,* 835 F.2d 517, 518–20 (3rd Cir.1987); *United States v. Wellman,* 830 F.2d 1453, 1462–63 (7th Cir.1987). The fraud set out in the James indictment does not by necessity require that the victims lost money or property when they were deprived of their right to honest government.

tice of the elements of mail fraud under *McNally* is premised upon its reliance on the constructive trust theory. We have rejected this concept in Part II B, *supra,* and we further conclude that the indictment does not provide any notice that the transfer of money or property from the victim to the defendant is an essential element of mail fraud against which James had to prepare a defense. *See United States v. Baldinger,* 838 F.2d 176, 181 (6th Cir.1988);[7] *Runnels,* 833 F.2d at 1194–95 (Guy, J., dissenting in part); *see also United States v. Covino,* 837 F.2d 65, 72 n. 2 (2d Cir.1988) (reversing wire fraud conviction on the basis of *McNally* ).

In addition to failing to provide adequate notice, the indictment here does not ensure that James was tried only on an offense charged by the grand jury. An indictment that does not allege an essential element of the crime cannot satisfy the Fifth Amendment requirement that a grand jury has considered and found all the elements to be present. *See United States v. Hooker,* 841 F.2d 1225, 1228 (4th Cir. 1988) (en banc). Accordingly, an indictment that does not state a mail fraud violation by alleging a loss of money or property by the victim cannot stand in light of *McNally. See, e.g., Baldinger,* 838 F.2d at 180; *United States v. Murphy,* 836 F.2d 248, 253–54 (6th Cir.1988); *United States v. Gimbel,* 830 F.2d 621, 624, 627 (7th Cir. 1987); *cf. Covino,* 837 F.2d at 72 n. 2; *United States v. Herron,* 825 F.2d 50 (5th Cir.1987) (wire fraud convictions reversed when indictment failed to set forth offense under *McNally* ).

In sum, we conclude that the indictment here, by failing to ensure that the grand jury returned an indictable offense

and by failing to provide James with notice of the elements of that offense, permitted James to be convicted on the basis of conduct that is not a federal crime. "There can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'present[s] exceptional circumstances' that justify collateral relief under § 2255." *Davis,* 417 U.S. at 346–47, 94 S.Ct. at 2305; *see also Strauss,* 516 F.2d at 984.

### 3. Fred A. Shelton

Shelton was charged in a 180 count indictment with 177 counts of mail fraud, and three counts of extortion in violation of 18 U.S.C. § 1951. He was convicted on thirty-seven of the mail fraud counts and all three extortion counts. The mail fraud counts on which Shelton was convicted all incorporated by reference the allegations in Count One, which states:

"1. At all times material to this Indictment, FRED A. SHELTON, the defendant herein, was an elected County Commissioner for Muskogee County, Oklahoma.

"2. At all times material to this Indictment, FRED A. SHELTON, in the performance of his official duties as County Commissioner would place orders and arrange the purchase of materials, supplies, and equipment from various vendors doing business with Muskogee County, thereby causing the County Clerk's office of that county to encumber funds and send through the United States Mails county warrants or checks in payment for the materials and supplies purchased.

"3. At all times material to this Indictment, FRED A. SHELTON was un-

---

**7.** The Government attempts to distinguish *Baldinger,* arguing that the record here does not reflect prejudice to the defense strategy. We disagree with the Government's assessment of the record. Particularly significant to the issue of whether James had notice that the Government had to prove loss of money or property by the fraud victims, i.e. county citizens, is the Government's closing argument.

"The instructions will tell you what we must prove. You have agreed in voir dire to follow those instructions and not require us to prove

things that the law does not require us to prove, because we didn't put any evidence on as to those things. For example, *we're not required to prove, ladies and gentlemen, it isn't an element, where the money came from that this defendant took. That's not an element. We didn't put any evidence on to try to prove that. The only issue is did he take money. That's the only issue. Not specifically where it came from."*

Rec., vol. V, at 4 (emphasis added).

der a duty to the citizens of Muskogee County to perform the functions of his office openly, honestly, impartially, free from corruption and undue influence, without receiving directly or indirectly any money or other valuable thing for the performance or nonperformance of any act or duty pertaining to his office other than the compensation allowed by law.

"4. During the period commencing on or about January 1, 1968, and continuing thereafter to on or about June 30, 1981, the exact dates of which are to this Grand Jury unknown, *FRED A. SHELTON*, the defendant herein, while serving as County Commissioner of Muskogee County, *devised and intended to devise a scheme to defraud the citizens of Muskogee County out of their right to have the business of Muskogee County conducted openly, honestly, impartially, free from corruption and undue influence,* and in accordance with the Official Oath of Office by their elected County Commissioner, and to use or cause the use of the United States Mails in furtherance of the scheme.

"5. As a part of this scheme to defraud the citizens of Muskogee County, FRED A. SHELTON, in his official capacity as a County Commissioner of Muskogee County did place orders and arrange the purchase of road and bridge building and maintenance materials and supplies for Muskogee County from various vendors, and, in particular, James Joseph Skipper, d/b/a S & S Supply, Henry Peak, d/b/a Muskogee Equipment and Supply; and Joe Swank, d/b/a Port City Road Supplies. *It was a further part of the scheme that the defendant did receive cash kickbacks from these sellers of road and bridge building and maintenance supplies in connection with both items delivered to and paid for by the county and items paid for by*

*the county but intentionally not delivered with defendant's full knowledge."*
Rec., vol. I, doc. 1, at 1–2 (emphasis added). In this appeal, Shelton contends that the indictment and instructions given at trial are contrary to *McNally,* and that the evidence is not sufficient to support his conviction under the mail fraud statute as construed in *McNally.*

The indictment here, unlike the James indictment discussed above, charges that as part of the scheme to deprive county citizens of their right to honest government Shelton received kickbacks not only on actual purchases, but on "items paid for by the county but intentionally not delivered with defendant's full knowledge." *Id.* at 2. This allegation of "split deals" or "fifty-fifty splits" charges fraudulent conduct that necessarily deprived county citizens of money or property by asserting that the county paid for items it never actually received. Although the mere allegation of receiving a kickback is not sufficient to state a mail fraud violation under *McNally,* here the count alleging split deals was expressly incorporated by reference into every mail fraud count. As a result, while all the mail fraud counts could be read as charging only kickbacks, they could also all be read as charging that each transaction involved a split deal.[8] We therefore conclude that the mail fraud counts state a crime under *McNally.*

The jury instructions given in this case pose a more serious problem. Under *McNally,* instructions on the elements of mail fraud must require the jury to find that the victim of the scheme was *itself* defrauded of money or property. *See* 107 S.Ct. at 2882. Accordingly, we must examine the instructions given here to determine whether they mandated the requisite finding.

In this case, the court informed the jury that the indictment contained the offenses alleged against the defendant and attached

---

8. We note that Shelton moved for a Bill of Particulars setting out which items the Government alleged the county had paid for but had never received. The motion was denied, presumably because the distinction between mere

kickbacks and split deals was simply not relevant when the underlying theory of fraud was the deprivation of intangible rights, which could be achieved by either type of conduct.

a copy of the indictment to the instructions, which the court allowed the jury to take into the jury room during deliberations. The instructions did not set forth the Government's theory on how Shelton's conduct had violated the mail fraud statute. Instead the court merely gave the jury the following general statement of the elements of the crime:

"Now, in order to establish the mail fraud offenses which are charged in Counts 1 through 177 of the indictment, the Government must prove the following essential elements beyond a reasonable doubt:

First: That the defendant devised or intended to devise a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises; and,

Second: That for the purpose of executing or furthering such scheme, or attempting so to do, the defendant placed, or knowingly caused to be delivered by mail, a letter or other mail matter in a post office or other authorized depository for mail matter, to be sent and delivered by the Postal Service.

*"The word 'scheme' includes any plan or course of action designed to deceive others, and by false or fraudulent pretenses, representations or promises, to obtain money or property from any person so deceived.*

"A statement or representation is 'false' if untrue when made and then known to be untrue by the person making it or causing it to be made.

"A statement or representation is fraudulent if known to be untrue by the person making it or causing it to be made, and made or caused to be made with the purpose and intent to deceive.

*"A 'scheme to defraud' means some plan to procure money or property by means of false pretenses or representations calculated to deceive persons of ordinary prudence."*

Rec., vol. III, at 837–38 (emphasis added).

Although the above definition of "scheme" states that it *includes* any plan by which the victim loses money or property, use of the open-ended word "includes" does not *require* the jury to find such a loss. This deficiency is compounded by the definition of "scheme to defraud", which states that it means a plan to acquire money or property *but does not require that this money or property come from the victim.* Read together, these instructions inform the jury that a scheme to defraud means *any* plan to obtain money or property, and that the money may or may not come from the victim. Moreover, as discussed above, the mail fraud counts in the indictment could all be read to allege only the taking of kickbacks from suppliers on actual purchases as the way in which county citizens were defrauded of their right to honest government. The jury here, as in *McNally*, was thus not required to find that the victim suffered pecuniary loss. Consequently, "the jury instruction on the mail fraud count permitted a conviction for conduct not within the reach of § 1341." *McNally*, 107 S.Ct. at 2882.

These instructions together with the lack of evidence of split deals requires us to conclude that Shelton is entitled to collateral relief. Shelton was convicted on counts forty-three through seventy-eight, all of which involved county purchases from supplier James Skipper. Skipper testified without contradiction that all of these transactions involved the payment of kickbacks on actual purchases, and none of them involved split deals. Although Skipper did testify about two split deals that he had done with Shelton, these acts were outside the statute of limitations, were not the subject of any count in the indictment, and were admitted only pursuant to Fed.R. Evid. 404(b).

Moreover, the evidence of several witnesses established without dispute that the payment of kickbacks had no impact on the way in which the price of county purchases was set. *See, e.g.*, Rec., vol. II, at 120–22, 197, 211, 362, 415–20. Every six months, the county drew up a list of anticipated purchases and then advertised for sealed bids on the items on the list. The price for

each item was then set by the lowest and best bid on that item. The price list was published. Although a supplier could obtain a sale on an item on the bid list by paying a kickback, his price had to meet the bid list price, as set by the lowest bid. Skipper testified that the price of items he sold to the county through Shelton was set by the bid price list. *Id.* at 253. Another supplier testified that he paid the kickback out of his profit on the sales. *Id.* at 211–12. The record thus contains no evidence that the payment of kickbacks caused the county any pecuniary loss.

## IV.

We conclude that the mail fraud convictions of James and Shelton are invalid. As set out above, both petitioners were also convicted of several counts of violating the Hobbs Act, which convictions are not challenged. James was convicted of twenty-three counts of mail fraud and three counts of extortion. He was given consecutive six month sentences and fined $1000 on each count, for a total of thirteen years and $26,000. He began serving his sentences on November 8, 1984. Shelton was convicted of thirty-seven counts of mail fraud and three counts of extortion. He was sentenced to consecutive five month sentences on each count, for a total of sixteen and one-half years. He began serving his sentence on March 8, 1985. The Government urges us to vacate the sentences on the Hobbs Act counts and remand the case to the district court to permit the court to increase the sentences on those counts. We do not believe vacation and remand with respect to the extortion counts is appropriate. *See generally United States v. Pisani*, 787 F.2d 71 (2d Cir.1986).

We reverse the decisions below and remand with instructions to grant the motions for relief under 28 U.S.C. § 2255.

REVERSED.